1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CENTRAL FLYWAY AIR, INC., JON
BOYCHUK,

                          Plaintiffs,

        v.

GREY GHOST INTERNATIONAL, LLC,

                          Defendant.

_____

GREY GHOST INTERNATIONAL, LLC,
and GREY GHOST GEAR OF CANADA,
LTD.,

                          Counter-Plaintiffs

        v.

JON BOYCHUK, CENTRAL FLYWAY
AIR, INC, and MILBURN MOUNTAIN
DEFENSE, LTD.,

                          Counter-Defendants.

No.  3:20-cv-05506-BJR

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
AND STRIKING COUNTER-
PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

## I.    **INTRODUCTION**

This lawsuit arises from a business dispute among numerous parties concerning the

management and assets of a Canadian company, Grey Ghost Gear of Canada, LTD ("GGGC" or

ORDER - 1

the "Company").  Plaintiffs Central Flyaway Air, Inc. ("CFA") and Jon Boychuk (together with CFA, "Plaintiffs") filed this lawsuit asserting claims for breach of contract and unjust enrichment against Defendant Grey Ghost International, LLC ("GGI" or "Defendant").  Dkt. 43 (Second Amended Complaint or "SAC").  In response, GGI, along with the Company, filed counterclaims asserting a variety of claims against CFA and Mr. Boychuk, in addition to third-party defendant Milburn Mountain Defense, Ltd. ("Milburn," together with CFA and Mr. Boychuk, "Counter-Defendants").  Dkt. 44 (Counterclaims or "CC").  Presently before the Court are Defendant GGI's motion for summary judgment on all of Plaintiffs' claims against it, and Counter-Plaintiff GGI's motion for summary judgment on most of its claims against Counter-Defendants.  Dkt. 83 ("Motions" or "Mot.").  Having reviewed the Motions, the submissions of the parties, and the relevant legal authorities, the Court GRANTS Defendant GGI's motion on Plaintiffs' claims against it, and strikes Counter-Plaintiff GGI's motion on the claims it asserts against Counter-Defendants.  The reasoning for the Court's decision follows.

## II.   BACKGROUND

### A.   Factual Background

#### 1.   GGGC and its Shareholders and Management

The following background facts concerning GGGC are undisputed.  GGGC was incorporated in May 2016 in Alberta, Canada, for the purpose of manufacturing and selling military tactical gear and equipment.  Initially, GGGC's sole shareholder was GGI; it was led by its CEO, Rene Bremmer; and its first facility was located in Alberta.  In December 2016, CFA, which was owned by Mr. Boychuk at all relevant times, purchased a 49% interest in GGGC.  Following CFA's investment, Mr. Boychuk became a director of GGGC, as CFA's representative,

and he soon replaced Bremmer as GGGC's CEO.[1]  Mr. Boychuk's wife, Krystle Boychuk, also joined GGGC as an employee.

### 2.    Mr. Boychuk's Alleged Investment in Grey Ghost Precision Canada

Plaintiffs allege that, around the time of CFA's investment in GGGC, Mr. Boychuk entered into an agreement with GGI concerning the establishment of a separate company, Grey Ghost Precision Canada ("GGPC"), that was to manufacture firearms in British Columbia.  SAC ¶¶ 9-10.  In his declaration, Mr. Boychuk states that GGI promised him, in exchange for his payment to GGI of $175,000, that GGI would "provide the equipment necessary to set up [GGPC's] manufacturing operations" and "issue [Mr. Boychuk] shares in GGPC."  Declaration of Jon Boychuk ("Mr. Boychuk Decl.," Dkt. 93-1) ¶ 24.  According to Mr. Boychuk, despite paying GGI that amount, GGI "never delivered [him] the promised shares in GGPC."  *Id.*

### 3.    The State of GGGC's Business When CFA Invested in the Company

The parties present starkly different descriptions of GGGC's operations at the time CFA invested in the Company.  GGI proffers the declarations of Kathryn Hanson and Casey Ingels, two of GGGC's directors, who state that the Company's Alberta facility had already been manufacturing a line of body armor and was also capable of supporting "online retail pick, pack, and ship" operations.  Declaration of Kathryn Hanson ("Hanson Decl.," Dkt. 86) ¶¶ 7-10; Declaration of Casey Ingels ("Ingels Decl.," Dkt. 85) ¶¶ 7-8.  According to Hanson and Ingels, the Company "was profitable, had substantial sales, an established customer base, finished goods inventory, raw goods inventory, staff, machinery, and equipment as well as a newly built out

---

[1] While the parties dispute the timing of, and circumstances surrounding, Mr. Boychuk's replacement of Bremmer as CEO, those disputed facts are not relevant to the Court's resolution of the Motions.

ORDER - 3

facility well before Jon Boychuk of Central Flyway Air, Inc. became a shareholder." Hanson Decl. ¶ 13; Ingels Decl. ¶ 8.

Counter-Defendants, on the other hand, proffer the declarations of Mr. Boychuk and Colin Noppers, GGGC's former Vice President of Sales, who state that "GGGC's Alberta facility was nothing more than an unfinished warehouse." Mr. Boychuk Dec. ¶¶ 3-5; *see* Declaration of Colin Noppers ("Noppers Decl.," Dkt. 93-4) ¶ 5. According to Mr. Boychuk, when he took over as CEO, the Company was unable to manufacture body armor or support "pick, pack, and ship" operations, and "had few deals or clients." Mr. Boychuk Dec. ¶¶ 3-5.

### 4.    Mr. Boychuk's Management of GGGC

The parties also present very different versions of Mr. Boychuk's management of GGGC. GGI proffers evidence that Mr. Boychuk, wielding total control over the Company, mismanaged it and misappropriated its assets. Counter-Defendants offer an alternative version of events that presents Mr. Boychuk as having limited authority to manage the Company, and clean hands in doing so.

### a.    GGI's Version of Events

Hanson and Ingels declare that the Company "began to steadily fall apart" once Mr. Boychuk became GGGC's CEO, and his management was a "disaster" throughout 2018 and 2019. Hanson Decl. ¶¶ 26-27, 40; Ingels Decl. ¶¶ 20-21, 27. According to Jenny Wagner, GGGC's bookkeeper who set up the Company's "Quickbooks" accounting system, Mr. Boychuk and Mrs. Boychuk had the highest level of access to that system and, by August 2018, had taken "100 percent control of all accounting, ordering, receiving, inventory, invoicing, banking, order fulfillment and customer service." Declaration of Jenny Wagner ("Wagner Decl.," Dkt. 89) ¶¶ 9-12. Despite that control, according to Hanson and Ingels, Mr. Boychuk ceased "performing any

functions or operations, from accounting, to shipping, invoicing or inventory."  Hanson Decl, ¶ 40; Ingels Decl, ¶ 27.  Mr. Boychuk, among other things, ordered significant amounts of inventory from vendors without paying for them; failed to fulfill large purchase orders; and "was spending an[] alarming amount of money."  Hanson Decl. ¶¶ 40-44; Ingels Decl. ¶¶ 27-28, 37.

More central to GGI's claims is the evidence it proffers that Mr. Boychuk and Mrs. Boychuk schemed to divert various of GGGC's assets for use in creating Milburn.  Several GGGC employees declare that, in July 2017, Boychuk – against Hanson's and Ingels' opposition – moved the Company's operations, including all of its inventory, machinery and equipment, from its Alberta facility to a facility Mr. Boychuk built on the Boychuks' personal property in British Columbia, Canada.  Hanson Decl. ¶¶ 28-31; Ingels Decl. ¶¶ 22-23; Wagner Decl. ¶¶ 1, 6-8.  According to Ingels, Mr. Boychuk had been running "a myriad of other businesses" from that property (Ingels Decl. ¶ 26), and according to Hanson, the facility that would house GGGC's operations "was basically a barn" that could not "run a successful manufacturing and pick, pack and ship order fulfillment station" (Hanson Decl. ¶ 38).  Two of GGGC's suppliers – Grey Ghost, LLC ("Grey Ghost") and Grey Ghost Precision, LLC ("Grey Ghost Precision") – declare that Mr. Boychuk began to order, on GGGC's account, significant amounts of inventory for delivery to the Boychuks' property.  Declaration of Trent Domser ("Domser Decl.," Dkt. 90) ¶¶ 4-6; Declaration of Aleena McCrea ("McCrea Decl.," Dkt. 88) ¶¶ 4-9.

In June 2019, Mr. Boychuk instructed Katie Garner, GGGC's Commercial Sales Manager, to provide him with GGGC's customer and sales lists, which Garner declares contained product pricing and discount information that was "extremely proprietary and unique to [GGGC]."  Declaration of Katie Garner ("Garner Decl.," Dkt. 87) ¶¶ 12-16.  That same month, Garner declares, she received phone calls from GGGC customers alerting her that Boychuk had contacted

them, advising them that he had started a new company called "Millburn Mountain Defense" and that they should only purchase products from him.  *Id*. ¶ 17.

In July 2019, Mrs. Boychuk incorporated Milburn, which is operated out of the same facility on the Boychuks' property that was used for GGGC's operations.  Declaration of Loren Cochran (Dkt. 84) ¶ 4, Ex. A at 5-8; Dkt. 57, Ex. B at 21.[2]  According to Hanson and Ingels, "Mr. Boychuk simply took all the inventory, equipment, machinery and customers and started Milburn." Hanson Decl. ¶ 53; Ingels Decl. ¶ 41.  In support of those assertions, Garner declares, based on her review of Milburn's website, that Milburn is advertising for sale the same products contained in the GGGC product list she provided to Mr. Boychuk in June 2019.  Garner Decl. ¶ 18, Ex. B. Grey Ghost and Grey Ghost Precision (GGGC's suppliers) declare, based on their review of Milburn's sales records produced in this litigation, that Milburn, which has never purchased inventory from Grey Ghost and Grey Ghost Precision, has been selling the same products that those suppliers previously provided to GGGC.  Domser Decl. ¶¶ 7-12; McCrea Decl. ¶¶ 10-16. Garner similarly declares, based on her review of Milburn's sales records, that Milburn has been selling inventory that had been purchased for GGGC.  Garner Decl. ¶¶ 20-24.

According to GGI, Mr. Boychuk also transferred to Milburn a research grant in which GGGC had been participating with the University of Alberta and Canada's Natural Sciences and Engineering Research Council ("NSERC").  Specifically, Ingels declares that, throughout 2016 and 2017, GGGC and the University of Alberta had collaborated in preparing and submitting a grant proposal to NSERC to conduct research into body armor.  Ingels Decl. ¶¶ 29-31.  In April 2020, GGGC was informed by the University of Alberta that GGGC's role in the grant had been

---

[2] Mrs. Boychuk is the sole shareholder and director of Milburn, which also employs Mr. Boychuk.  Dkt. 57, Ex. B at 9.

ORDER - 6

transferred to Milburn. *Id.* ¶ 32.  Based on documents reviewed by Ingels and submitted with the Motions – including (1) a letter and grant documents reflecting that Boychuk had been representing himself to University of Alberta and NSERC as GGGC's sole owner (*id.*, Exs. B-C); and (2) a May 2020 invoice associated with the grant, addressed to Milburn and bearing Mr.  Boychuk's and Mrs. Boychuk's names (*id.*, Ex. A) – Ingels declares that he believes Mr. Boychuk transferred the grant to Milburn.[3]

### b.    Plaintiffs'/Counter-Defendants' Version of Events

Counter-Defendants dispute that Mr. Boychuk mismanaged GGGC or that he and Mrs. Boychuk undertook a scheme to misappropriate GGGC's assets.  With respect to GGGC's management, Mr. Boychuk and Mrs. Boychuk both declare that neither of them had full control over the Company's operations, or maintained a higher level of access to GGGC's inventory ordering or accounting system than other GGGC employees.  Mr. Boychuk Decl. ¶¶ 9, 13; Declaration of Krystle Boychuk ("Mrs. Boychuk Decl.," Dkt. 93-3) ¶¶ 2-3.  In actuality, they declare, Hanson and Ingels "remained actively involved in the management of GGGC," and Hanson alone had the highest access credentials to the accounting system.  Mr. Boychuk Decl. ¶¶ 9, 13; Mrs. Boychuk Decl. ¶¶ 2-3.

Responding to GGI's misappropriation allegations, Mr. Boychuk declares that Ingels had approved his decision to move the Company's operations to the Boychuks' property in order to resolve ongoing issues with the Alberta facility's lease and with the Company's then former CEO, Bremmer.  Mr. Boychuk Decl. ¶¶ 12, 28.  Mr. Boychuk further declares that neither Counter-

---

[3] While not relevant to the Court's resolution of the Motions, Counter-Plaintiffs point to evidence of other improper conduct, including: (1) Mr. Boychuk's use of his corporate GGGC credit card for personal expenses (Hanson Decl. ¶ 41; Ingels Decl, ¶ 28); and (2) Mr. and Mrs. Boychuk's use of a Nicaraguan manufacturer, Alternative Manufacturing, to produce counterfeit versions of Grey Ghost products – ordered on GGGC's behalf – that were then branded and sold as Milburn products (Domser Decl. ¶¶ 13-14, Ex. C).

Defendants nor Mrs. Boychuk retained any GGGC assets beyond certain small-value items that the Company never sought to recover.[4]  *Id.* ¶ 29.  Mr. Boychuk does not deny that Milburn made use of GGGC's customer and sales lists or inventory purchased for GGGC.  Instead, he declares only that Plaintiffs had "purchased new production equipment for Milburn" (Mr. Boychuk Decl. ¶ 27) and that Noppers – who, at some point, left GGGC for Milburn – was Milburn's primary salesperson who did "most of the product ordering" (*id.* ¶ 19).  In his declaration, Noppers says nothing about Milburn's product ordering or sales.  *See* Noppers Decl.  Mrs. Boychuk, however, declares that Milburn never sold GGGC inventory, and that the products Milburn sold had been newly manufactured, and sold to Milburn, by Alternative Manufacturing.  Mrs. Boychuk Decl. ¶ 9; *see supra* at n.3.

In June 2019, Mr. Boychuk and Hanson discussed possible ways of disentangling GGI from CFA, including through a dissolution of GGGC or one party's purchase the other's stake in the Company.  Hanson Decl. ¶¶ 49-50, Ex. C.  No such arrangement ever came to fruition.  *Id.*

## B.    Procedural History

This lawsuit was filed by CFA and Mr. Boychuk on May 29, 2020.  Following two successive motions to dismiss before Judge Bryan (Dkts. 16, 32), Plaintiffs filed their Second Amended Complaint.  In it, CFA and Mr. Boychuk separately assert claims against GGI for breach of contract and unjust enrichment.  *See* SAC.[5]  In response, GGI filed counterclaims against Counter-Defendants, asserting various claims on its own behalf and derivatively on GGGC's

---

[4] Specifically, Mr. Boychuk declares that he has retained approximately $8,000 in nylon and a defective armor press that is "likely only worth scrap value."  Mr. Boychuk Decl. ¶ 29.

[5] The Second Amended Complaint also purports to assert a claim for breach of fiduciary duty against Ingels (*see* SAC ¶¶ 15-18), however Judge Bryan previously dismissed all claims against Ingels with prejudice.  Dkt. 32.  As such, the Court deems Plaintiffs' claim for breach of fiduciary duty to no longer be asserted.

behal.[6]  Specifically, Counter-Plaintiffs assert counterclaims for (1) breach of fiduciary duty; (2) conspiracy to breach fiduciary duty; (3) violation of Washington's Uniform Trade Secrets Act, RCW § 19.108; (4) unjust enrichment; (5) conversion; (6) an accounting; and (7) the judicial dissolution of GGGC.  *See* CC ¶¶ 30-94.

On December 7, 2021, Defendant GGI moved for summary judgment on all of Plaintiffs' claims against it, and Counter-Plaintiff GGI moved for summary judgment on most of its claims against Counter-Defendants.  Plaintiffs and Counter-Defendants opposed those motions ("Opp.," Dkt. 93) and Defendant and Counter-Plaintiff GGI replied ("Rep.," Dkt. 94).  On August 8, 2022, this case was reassigned to this Court.

## III.    STANDARD OF REVIEW

"The standard for summary judgment is familiar: 'Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact.'"  *Zetwick v. County of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017) (quoting *United States v. JP Morgan Chase Bank Account No. Ending 8215*, 835 F.3d 1159, 1162 (9th Cir. 2016)).  "The moving party bears the initial burden of identifying portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim."  *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020).  "If the moving party meets this burden, the opposing party must then set out specific facts showing a genuine issue for trial to defeat the motion."  *Id.*  If the evidence proffered by the opposing party "is merely colorable, or is not significantly probative, summary judgment may be granted."

---

[6] The Counterclaims state – and Counter-Defendants do not dispute – that GGGC's board of directors has consented to GGI's prosecution of the claims asserted on the Company's behalf.  CC ¶ 5.

ORDER - 9

1    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations and quotation marks

2    omitted).

## IV.   DISCUSSION

### A.    Defendant GGI's Motion for Summary Judgment on Plaintiffs' Claims

Defendant moves for summary judgment on CFA's and Mr. Boychuk's separately asserted

claims for breach of contract and unjust enrichment. *See* SAC ¶¶ 19-34; Mot. at 12-17.  As noted

above, "[t]o survive summary judgment, a non-moving party must show through specific evidence

that a triable issue of fact remains on issues for which the nonmovant bears the burden of proof at

trial." *LVB-Ogden Mktg. LLC v. Bingham*, No. 18-cv-786, 2018 WL 6082962, at *1 (W.D. Wash.

Nov. 21, 2018).   The record presented by Plaintiffs in support of their claims is woefully

inadequate to survive summary judgment.

### 1.    CFA's Breach of Contract Claim Against GGI

Defendant moves for summary judgment on CFA's breach of contract claim, premised on

allegations that GGI breached three separate provisions of a Unanimous Shareholder Agreement

(the "Shareholder Agreement") that CFA entered into with GGI and GGGC upon CFA's

investment.   *See* SAC ¶¶ 19-25.   Specifically, CFA claims that GGI breached:

(1) Section 5.1, which prohibits shareholders from causing or permitting GGGC to effect any

change in its capital structure; (2) Section 5.4, which provides shareholders the right to access the

Company's books and records; and (3) Section 5.5, which provides shareholders the right to

perform an audit of the Company's books and records.  *See id.* ¶ 20, Ex. 1.[7]

---

[7] Defendant argues that CFA's claim fails at the outset because "[t]he purported Shareholder Agreement that Plaintiffs rely on was never signed or otherwise finalized." Mot. at 13.  In opposing Defendant's motion, Plaintiffs submit a signature page to the Shareholder Agreement that bears Mr. Boychuk's signature, on behalf of CFA, and Ingels' signature, on behalf of GGI.  *See* Mr. Boychuk Decl., Ex. 2.  Defendant, in the Reply, abandons its argument.  In light of the undisputed evidence that both parties signed the Shareholder Agreement, no reasonable juror could conclude that the parties did not finalize or enter into the Shareholder Agreement.

### a.    CFA's Claim that GGI Breached Section 5.1

Section 5.1 of the Shareholder Agreement provides, in relevant part, that "Shareholders shall not cause or permit the Corporation … to … [effect] any change in the authorized or issued capital of the Corporation or alteration of its capital structure in any way, including a repurchase of any securities in the capital of the Corporation."  SAC, Ex. 1 at 12 § 5.1(c).  Plaintiffs allege that GGI violated this section by taking various actions to "depriv[e] CFA of both the information necessary to ascertain the value of its stock holdings" and to "strip[] CFA of any governing influence over GGGC," thereby "render[ing] the GGGC's stock in CFA's hands nearly valueless." SAC ¶ 20.  Defendant contends that the evidence shows that CFA had been deprived of neither access to information nor governing influence, and instead demonstrates that Mr. Boychuk, CFA's representative, "was in complete control of the Company."  Mot. at 13-14.

The parties misread Section 5.1, which does not deal with shareholders' rights to access the Company's financial information or influence its business.  Rather, that section imposes restrictions on shareholders' ability to "change [] the authorized or issued capital of the Corporation or alter[] [] its capital structure."[8]  CFA does not allege – let alone proffer evidence demonstrating – that GGI caused GGGC to issue or authorize new capital, or otherwise undertook any actions with respect to GGGC's capital structure.  While Plaintiffs allege that GGI's actions caused a decrease in the value of CFA's stock in GGGC, Section 5.1 has no bearing on the Company's stock value within the Company's existing – *i.e.*, unchanged – capital structure.  As such, GGI's alleged conduct does not constitute a violation of Section 5.1.

---

[8] A company's capital structure generally refers to the mixture of equity, debt, and other contractual obligations used to finance it.  *See* Alan S. Gutterman, *Business Transactions Solutions* § 152:131 (Sept. 2022).

ORDER - 11

Even if Section 5.1 did relate to shareholders' access to information or governing influence, Plaintiffs fail to proffer any evidence that GGI undertook any actions to deprive CFA of those things.  The sole piece of evidence Plaintiffs contend supports CFA's claim is a screenshot of a text message conversation, annexed to Mr. Boychuk's declaration, in which a person identified only as "Kathy" tells an unidentified individual that she "deleted [Mrs. Boychuk] from Quickbooks" and was "changing all the Canada passwords."  *See* Mr. Boychuk Decl., Ex. 3.  As an initial matter, the screenshot has not been authenticated, and therefore will not be considered by the Court.  *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("We have repeatedly held that unauthenticated documents cannot be considered in a motion for summary judgment.").  Mr. Boychuk, in his declaration, does not claim to have sent or received any of the messages, identify any of its participants, or even explain the meaning of the messages.[9]  As such, the screenshot does not satisfy the requirements under Rule 901 of the Federal Rules of Civil Procedure for authenticating evidence, and will not be considered by the Court.  *See Patterson v. Miller*, 451 F. Supp. 3d 1125, 1143 (D. Ariz. 2020) (holding that photographs of text messages lacked authentication, and would not be considered, where they "provide[d] no information regarding the sender or recipient of the text messages, aside from merely the name 'Michelle.'").

Even if that text message conversation could properly be considered, it would not support CFA's claim.  While Mr. Boychuk declares that the text message conversation "indicat[es] Defendants' intent to cut off" his access to the Company's Quickbooks system, nothing about that conversation even remotely suggests GGI's involvement, let alone demonstrates that GGI had

---

[9] While the Opposition purports to identify the individuals who sent and received the text messages (*see* Opp. at 9-10 n.1), Plaintiffs cannot authenticate the text messages through counsel's representation in a brief.  *See, e.g.*, *Merrill v. Golik*, No. 12-cv-5674, 2013 WL 5176844, at *1 (W.D. Wash. Sept. 13, 2013) (striking exhibits attached to counsel's declaration because he lacked personal knowledge of them and "had no hand in their creation").  Likewise, the Court will not accept Plaintiffs' counsel's factual representation as to which individuals participated in the conversation.

deprived – or directed anyone to deprive – either Boychuk or CFA of their ability to access the Company's information or influence its business.   Indeed, Plaintiffs present no evidence that anyone ultimately cut off Mr. Boychuk's access to the Quickbooks system.   Accordingly, no reasonable juror could conclude that GGI breached Section 5.1 of the Shareholder Agreement.

### b.   CFA's Claim that GGI Breached Section 5.4 and Section 5.5

Section 5.4 provides that "[e]ach shareholder shall have access during business hours and on no less than 48 hours prior notice to all financial statements, other books and records of and information concerning [the Company] …."   SAC, Ex. 1 at 13 § 5.4.   Similarly, Section 5.5 provides that "[e]ach Shareholder (at its sole cost and expense) will have the right to perform, from time to time, either itself or through representatives of its choosing, an audit of all the Corporations books, records and accounts (including bank accounts)."   *Id.*, Ex. 1 at 13 § 5.5.   Plaintiffs allege that GGI breached these provisions by denying CFA access to the company's books and records despite its "repeated demands … that it be permitted access."   *Id.* ¶ 20.   Defendants contend, correctly, that there is insufficient evidence for these claims to survive summary judgment.   *See* Mot. at 13.

Plaintiffs submit no evidence that CFA had ever sought to access the Company's books and records or to perform an audit.   While Plaintiffs point to a statement in Mr. Boychuk's declaration that "[a]ccess to my email and to the Company's Quickbook files was reasonably necessary for me to perform my duties for GGGC" (Mr. Boychuk Decl. ¶ 23; *see* Opp. at 9), that statement bears on Boychuk's need for access to the Company's books in his capacity as GGGC's CEO – *i.e.*, for purposes of managing the Company – and not as CFA's representative.   Moreover, as explained above with respect to CFA's claim that GGI breached Section 5.1, Plaintiffs proffer no evidence that GGI undertook any actions to deny CFA access to the Company's books and

ORDER - 13

records or prevent it from performing an audit.  *See supra* at 12-13.  Accordingly, CFA's claim that GGI breached Section 5.4 and Section 5.5 also fails.[10]

Accordingly, the Court grants summary judgment to Defendant on CFA's breach of contract claim.

### 2.   Mr. Boychuk's Breach of Contract Claim Against GGI

Defendant moves for summary judgment on Mr. Boychuk's claim for breach of contract, premised on allegations that GGI and Mr. Boychuk had agreed that, in exchange for Mr. Boychuk's payment of $175,000 to GGI, GGI would "(i) provide the equipment necessary to set up GGPC's manufacturing operations, and (ii) provide Jon Boychuk with shares in GGPC."  SAC ¶ 26. Plaintiffs allege that GGI, despite receiving the $175,000 payment, "breached its promise by failing to provide the equipment necessary for GGPC's operations, rendering Mr. Boychuk's shares in GGPC monetarily valueless."  *Id.* ¶ 27.  Defendant argues, among other things, that Plaintiffs proffer insufficient evidence that any such agreement existed.  *See* Mot. at 15-16; Rep. at 7.  Defendant is correct.

Plaintiffs submit no document memorializing any agreement concerning GGPC.  Instead, they point to a sentence in Mr. Boychuk's declaration that simply repeats – conclusorily, and nearly verbatim – the Second Amended Complaint's allegation that this agreement existed.  Mr. Boychuk Decl. ¶ 24.[11]  Mr. Boychuk's assertion, on its own, is insufficient to demonstrate that the alleged

---

[10] Neither Plaintiffs nor Defendant addresses the allegation in the Second Amended Complaint that "GGI breached its implied contractual duty of good faith and fair dealing by allowing [Ingels] to effectively strip [CFA] of the benefit of its bargain in entering into the [] Shareholder Agreement."  SAC ¶ 23.  Plaintiffs allege, in particular, that GGI "lock[ed] … Jon Boychuk [] out of management of GGGC" and deprived CFA of the Company's financial information.  *Id.*  Plaintiffs, however, fail to support this claim for the same reason that they proffer insufficient evidence demonstrating that GGI breached specific provisions of the Shareholder Agreement.  *See supra* at 12-14.

[11] Specifically, Mr. Boychuk declares that "GGI, by and through Casey Ingels, promised me: (i) That GGI would provide the equipment necessary to set up manufacture operations for a separate company named GGCP, and (i) That GGI would issue me shares in GGPC."  Mr. Boychuk Decl. ¶ 24.

ORDER - 14

agreement between Mr. Boychuk and GGI existed.  As an initial matter, the agreement as alleged is far too indefinite as to the terms of GGI's provision of equipment and issuance of shares to constitute an enforceable contract.  *See Keatley v. Bruner*, 194 Wash. App. 1010 (Wn. Ct. App. 2016) ("[p]reliminary agreements 'must be definite enough on material terms to allow enforcement without the court supplying those terms'" (quoting *Setterlund v. Firestone*, 104 Wash. 2d 24, 25, 700 P.2d 745, 746 (Wn. Sup. Ct. 1985)))).[12]  More importantly, "[a] conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997).  Plaintiffs point to no evidence corroborating Mr. Boychuk's self-serving declaration that the alleged agreement existed, or indicating any circumstances under which it came into being.  *See Carter v. Clark Cnty.*, 459 F. App'x 635, 636 (9th Cir. 2011) ("this court has refused to find a genuine issue where the only evidence presented is uncorroborated and self-serving testimony").  The Court therefore finds that no reasonable juror could conclude that Mr. Boychuk and GGI entered into an agreement concerning his investment in GGPC.  *See, e.g.*, *Tinn v. EMM Labs, Inc.*, No. 07-cv-963, 2009 WL 507096, at *1 (D. Or. Feb. 27, 2009) (granting summary judgment because plaintiff had "not presented evidence sufficient to permit a reasonable juror to conclude that the parties reached a meeting of the minds on specific terms").  Accordingly, the Court grants summary judgment to Defendant on Mr. Boychuk's claim for breach of contract.

---

[12] In briefing Plaintiffs' claims for breach of contract and unjust enrichment, the parties cite to Washington law. Although it is possible that another jurisdiction's law applies to those claims, this Court will apply Washington law in the absence of any indication of a conflict between the applicable Washington law and the law of other potentially relevant jurisdictions.  *See Prime Start Ltd. v. Maher Forest Prod., Ltd.*, 442 F. Supp. 2d 1113, 1119 (W.D. Wash. 2006) ("Washington courts will not engage in a conflicts analysis unless a true conflict exists.").

ORDER - 15

### 3.      Mr. Boychuk's Unjust Enrichment Claim Against GGI

Defendant moves for summary judgment on Mr. Boychuk's claim for unjust enrichment, which is premised on allegations that GGI has unjustly retained Mr. Boychuk's alleged $175,000 payment without delivering the equipment necessary for GGPC's operations or otherwise providing anything in return to Mr. Boychuk.  SAC ¶¶ 29-31.  To prevail on an unjust enrichment claim, the plaintiff must establish: "a benefit conferred upon the defendant by the plaintiff; an appreciation or knowledge by the defendant of the benefit; and the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Young*, 164 Wash. 2d at 484 (citation omitted). Defendant contends that Plaintiffs fail to demonstrate that Mr. Boychuk ever paid GGI $175,000, and thus cannot establish "a benefit conferred upon the defendant by the plaintiff."  *See* Mot. at 16; Rep. at 7-8.

Once again, the record presented by Plaintiffs is markedly inadequate for Mr. Boychuk's claim to survive summary judgment.  The only evidence proffered by Plaintiffs supporting Mr. Boychuk's alleged payment to GGI is his declaration that he "pledged $175,000 to acquire [] shares in GGPC," and that "GGI accepted these funds."  Mr. Boychuk Decl. ¶ 24.  Plaintiffs, however, submit no evidence corroborating that declaration.  They submit no record of the alleged payment, no document memorializing Mr. Boychuk's intent to make the payment, and no statement from any witness recalling that such payment was made.  Mr. Boychuk's "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact" as to whether he made the $175,000 payment as alleged.  *See Publ'g Clearing House*, 104 F.3d at 1171; *see also Carter*, 459 F. App'x at 636.  As such, Plaintiffs do

ORDER - 16

not establish that Mr. Boychuk conferred of a benefit on GGI as necessary to prevail on his unjust enrichment claim.  Accordingly, the Court grants summary judgment to Defendant on that claim.

### 4.    CFA's Unjust Enrichment Claim Against GGI

Finally, Defendant moves for summary judgment on CFA's unjust enrichment claim, premised on allegations that "GGI effected a de facto theft of CFA's shares in GGGC" by taking various actions that "effectively (i) locked CFA out of the governance of GGGC, and (ii) nullified (for economic purposes) CFA's ownership of shares of GGGC."  SAC ¶¶ 32-34.  Defendant contends that "there is no evidence that CFA conferred any benefit on GGI," and no evidence "that GGI has 'wrongfully retained' anything of value belonging to CFA."  Mot. at 16.

The Court agrees with Defendant.  Contrary to Plaintiffs' assertion that GGI "wrested CFA's shares in GGGC without payment" (Opp. at 12), Plaintiffs point to no evidence – or even allege – that GGI ever claimed ownership or control over CFA's shares in GGGC.  Plaintiffs argue only that GGI's efforts to exclude CFA from management of, and access to, GGGC caused CFA's shares in the Company to lose value.  As an initial matter, the actions Plaintiffs accuse GGI of undertaking are unsupported by the evidence.  *See supra* at 12-13.  Even if they were, Plaintiffs offer no explanation – and certainly present no evidence – demonstrating that GGI gained anything from the loss in value of CFA's shares.  Indeed, the undisputed evidence shows that GGI and CFA have maintained their respective stakes in the Company since CFA's 2016 investment (*see* Hanson Decl. ¶¶ 49-50, Ex. C), with neither party taking ownership over – let alone stealing – the other's shares.  As such, Plaintiffs fail to establish that GGI was unjustly enriched by CFA.

Accordingly, the Court grants summary judgment to Defendant GGI on all of Plaintiffs' claims against it.

ORDER - 17

**B.** **Counter-Plaintiff GGI's Motion for Summary Judgment on Certain of its Claims against Counter-Defendants**

As noted above, in response to Plaintiffs' lawsuit, GGI and GGGC filed counterclaims asserting various claims against Counter-Defendants CFA, Mr. Boychuk, and Milburn. The Court understands only GGI, and not GGGC, to be seeking summary judgment on certain of the counterclaims. Specifically, GGI moves for summary judgment on its claims for (1) breach of fiduciary duty, asserted against Mr. Boychuk (CC ¶¶ 30-34); (2) conspiracy to breach fiduciary duty, asserted against Mr. Boychuk, CFA and Milburn (*id*. ¶¶ 40-47); (3) violation of Washington's Uniform Trade Secrets Act ("WUTSA"), asserted against Mr. Boychuk, CFA and Milburn (*id*. ¶¶ 48-57); (4) unjust enrichment, asserted against Mr. Boychuk and Milburn (*id*. ¶¶ 64-71); and (5) conversion, asserted against Mr. Boychuk, CFA and Milburn (*id*. ¶¶ 77-83). *See* Mot. at 17-23.[13] As discussed below, the Court will strike Counter-Plaintiff GGI's motion, with leave to refile it addressing the issues identified below.

**1.** **Whether GGI Has Standing to Assert its Claims**

The Court questions whether GGI has standing to assert, and this Court has subject matter jurisdiction over, the claims on which Counter-Plaintiff GGI seek summary judgment. As GGI explains in its motion, its claims are all premised on Mr. Boychuk's alleged misappropriation of various assets belonging to the Company. *See, e.g.*, Mot. at 18 (arguing that Boychuk breached his fiduciary duty to GGI through his "misappropriation of GGGC's inventory, assets and trade

---

[13] The Court understands that Counter-Plaintiffs are not moving for summary judgment on (1) GGGC's breach of fiduciary claim against Mr. Boychuk (*see* CC ¶¶ 35-39); (2) GGGC's conspiracy to breach fiduciary duty claim against Mr. Boychuk, CFA and Milburn (*id*. ¶¶ 40-47); (3) GGGC's unjust enrichment claim against Mr. Boychuk, CFA and Milburn (*id*. ¶¶ 58-63); (4) GGGC's conversion claim against Mr. Boychuk, CFA and Milburn (*see id*. ¶¶ 72-76); (5) GGGC's and GGI's claim for an accounting against Mr. Boychuk and CFA (*see id*. ¶¶84-89); and (6) GGGC's and GGI's claim for a judicial dissolution of GGGC (*see id*. ¶¶ 90-94). To the extent Counter-Plaintiffs intended to seek summary judgment on any of these claims, they should make that clear in a renewed motion that may be filed no later than October 18, 2022.

ORDER - 18

secrets to run Milburn"), at 22 (arguing that "Boychuk, CFA and Milburn have been unjustly enriched by misappropriating GGGC's trade secrets, and by unlawfully transferring and using the assets and inventory of GGGC in order to operate Milburn").  Insofar as GGI does not demonstrate that it – as a shareholder of GGGC – suffered a direct injury resulting from the alleged misappropriation, the Court questions whether GGI has standing to assert its claims.  *See Woods View II, LLC v. Kitsap Cnty.*, No. C10-5114, 2011 WL 2491594, at *4 (W.D. Wash. June 22, 2011) (noting that "[a] shareholder does not have standing to redress an injury to the corporation" (citation and quotation marks omitted)); *see also, e.g.*, *Uthe Tech. Corp. v. Aetrium Inc.*, 739 F. App'x 903, 905-06 (9th Cir. 2018) (shareholder's allegations that "[c]onspirators stole [company's] customers and thus harmed [company's] business, thereby reducing the value of [company's] stock" was an indirect injury insufficient for standing).

While Counter-Defendants do not raise the issue of GGI's standing in opposing its motion, "[s]tanding is a threshold matter central to [courts'] subject matter jurisdiction," and courts "must assure [themselves] that the constitutional standing requirements are satisfied before proceeding to the merits."  *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007).  Therefore, "[f]ederal courts are required *sua sponte* to examine jurisdictional issues such as standing." *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 954 (9th Cir. 2011).  Given that the parties have not briefed this issue, the Court will provide the parties the opportunity to do so before determining whether to dismiss GGI's claims for lack of subject matter jurisdiction.  As such, the Court hereby strikes Counter-Plaintiff GGI's motion for summary judgment on its claims.  The Court will permit GGI to file a renewed motion for summary judgment on those claims, addressing whether GGI has standing to assert them, no later than October 18, 2022.

ORDER - 19

### 2.   Whether WUTSA Applies to Counter-Defendants' Alleged Conduct

GGI and GGGC assert a claim for violation of WUTSA against Mr. Boychuk, CFA and Milburn premised on allegations that Mr. Boychuk misappropriated Counter-Plaintiffs' trade secrets for purposes of operating Milburn.  CC ¶¶ 48-57; *see* Mot. at 20-22.  In opposing GGI's motion on its WUTSA claim, Counter-Defendants argue that GGI fails to demonstrate that the information at issue constituted a "trade secret."  Opp. at 14-15.

In their briefs, the parties do not address whether, in the first instance, WUTSA applies to the alleged conduct upon which Counter-Plaintiffs' claim is based.  Courts have found that Washington's laws do not apply extraterritorially where the relevant parties, and the acts giving rise to the claim, were located outside of Washington.  *See, e.g.*, *Trader Joe's Co. v. Hallatt*, 835 F.3d 960, 977 (9th Cir. 2016) (Washington's Consumer Protection Act did not apply extraterritorially where defendants resided in Canada and their conduct occurred there); *Red Lion Hotels Franchising, Inc. v. MAK, LLC*, 663 F.3d 1080, 1090 (9th Cir. 2011) (Washington's Franchise Investment Protection Act did not apply where the franchisee and franchiser, and the relevant conduct, were located outside Washington).  Here, GGI (based in Wyoming (*see* CC ¶ 4)) and GGGC (based in Canada (*see id*. ¶ 5)) contends that Mr. Boychuk (a resident of Canada (*see id*. ¶ 6)) misappropriated confidential information belonging to GGGC in order to benefit himself, Milburn, and CFA (both entities based in Canada (*see id*. ¶¶ 7-8)).  *See* Mot. at 20-22.  Further, GGI does not appear to claim – or submit evidence showing – that any of the allegedly misappropriated information was generated, misappropriated, or used in Washington.  Given the lack of evidence that these parties or their conduct were located in Washington, the Court questions whether WUTSA applies here.  *Cf. Personalize Inc. v. Magnetize Consultants Ltd*., 437 F. Supp.

ORDER - 20

3d 860, 879 (W.D. Wash. 2020) (dismissing WUTSA claim because plaintiff did not allege that the relevant acts occurred in Washington or were committed by or against a Washington resident).

The Court will provide the parties the opportunity to brief the issue of WUTSA's applicability before ruling on this issue.  Therefore, Counter-Plaintiff GGI should address, as part of its renewed motion for summary judgment, the applicability of WUTSA.

Accordingly, the Court strikes Counter-Plaintiff GGI's motion for summary judgment, with leave to file a renewed motion no later than October 18, 2022.

## V.   **CONCLUSION**

NOW, THEREFORE, the Court rules as follows:

1. The Court GRANTS Defendant GGI's motion for summary judgment (Dkt. 83), and dismisses CFA's and Mr. Boychuk's claims for breach of contract and unjust enrichment.

2. The Court strikes Counter-Plaintiff GGI's motion for summary judgment, with leave to file a renewed motion no later than October 18, 2022.[14]

IT IS SO ORDERED.

Dated:  September 28, 2022

Barbara Jacobs Rothstein
U.S. District Court Judge

---

[14] The renewed motion shall be briefed in accordance with Section II(A) of this Court's Standing Order For All Civil Cases (Dkt. 185).

ORDER - 21