1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8

9

CENTRAL FLYWAY AIR, INC., JON
BOYCHUK,

10

               Plaintiffs,

11

     v.

12

GREY GHOST INTERNATIONAL, LLC,

13

             Defendant.

14

15

16

17

GREY GHOST INTERNATIONAL, LLC,
and GREY GHOST GEAR OF CANADA,
LTD.,

18

19

          Counter-Plaintiffs

20

     v.

21

JON BOYCHUK, CENTRAL FLYWAY
AIR, INC, and MILBURN MOUNTAIN
DEFENSE, LTD.,

22

23

          Counter-Defendants.

24

25

26

No.  3:20-cv-05506-BJR

ORDER GRANTING IN PART
COUNTER-PLAINTIFFS' RENEWED
MOTION FOR SUMMARY JUDGMENT
AND DISMISSING GREY GHOST
INTERNATIONAL, LLC'S
COUNTERCLAIMS

ORDER - 1

# I.   INTRODUCTION

This lawsuit arises from a business dispute among numerous parties concerning the management and assets of a Canadian company, Grey Ghost Gear of Canada, LTD ("GGGC" or the "Company").  Presently before the Court is a renewed motion for summary judgment filed by Counter-Plaintiffs Grey Ghost International, LLC ("GGI") and GGGC (together, "Counter-Plaintiffs") on their counterclaims against Counter-Defendants Central Flyaway Air, Inc. ("CFA"), Jon Boychuk, and Milburn Mountain Defense, Ltd. (collectively, "Counter-Defendants").  Dkt. 100 ("Motion" or "Mot.").  Having reviewed the Motion, the submissions of the parties, and the relevant legal authorities, the Court GRANTS the Motion in part, and DISMISSES all of GGI's counterclaims.  The reasoning for the Court's decision follows.

# II.   BACKGROUND

## A. **Factual Background**

### 1.  **GGGC and its Shareholders and Management**

The following background facts concerning GGGC are undisputed.  GGGC was incorporated in May 2016 in Alberta, Canada, for the purpose of manufacturing and selling military tactical gear and equipment.  Initially, GGGC's sole shareholder was GGI; it was led by its CEO, Rene Bremmer; and its first facility was located in Alberta.  In December 2016, CFA, which was owned by Mr. Boychuk at all relevant times, purchased a 49% interest in GGGC.  Following CFA's investment, Mr. Boychuk became a director of GGGC, as CFA's representative, and he soon became GGGC's CEO.  Mr. Boychuk's wife, Krystle Boychuk, also joined GGGC as an employee.

ORDER - 2

### 2.   The State of GGGC's Business When CFA Invested in the Company

The parties present starkly different descriptions of GGGC's operations at the time CFA invested in the Company.   Counter-Plaintiffs proffer the declarations of Kathryn Hanson and Casey Ingels, two of GGGC's directors, who state that the Company's Alberta facility had already been manufacturing a line of body armor and was also capable of supporting "online retail pick, pack, and ship" operations.   Declaration of Kathryn Hanson ("Hanson Decl.," Dkt. 86) ¶¶ 7-10; Declaration of Casey Ingels ("Ingels Decl.," Dkt. 85) ¶¶ 7-8.   According to Hanson and Ingels, the Company "was profitable, had substantial sales, an established customer base, finished goods inventory, raw goods inventory, staff, machinery, and equipment as well as a newly built out facility well before Jon Boychuk of Central Flyway Air, Inc. became a shareholder."   Hanson Decl. ¶ 13; Ingels Decl. ¶ 8.

Counter-Defendants, on the other hand, proffer the declarations of Mr. Boychuk and Colin Noppers, GGGC's former Vice President of Sales, who state that "GGGC's Alberta facility was nothing more than an unfinished warehouse."   Declaration of Jon Boychuk ("Mr. Boychuk Decl.," Dkt. 104-1) ¶¶ 3-5; *see* Declaration of Colin Noppers ("Noppers Decl.," Dkt. 104-3) ¶ 5. According to Mr. Boychuk, when he took over as CEO, the Company was unable to manufacture body armor or support "pick, pack, and ship" operations, and "had few deals or clients."   Mr. Boychuk Dec. ¶¶ 3-5.

### 3.   Mr. Boychuk's Management of GGGC

The parties also present very different versions of Mr. Boychuk's management of GGGC. Counter-Plaintiffs proffer evidence that Mr. Boychuk, wielding total control over the Company, mismanaged it and misappropriated its assets.   Counter-Defendants offer an alternative version of

ORDER - 3

events that presents Mr. Boychuk as having limited authority to manage the Company, and clean hands in doing so.

### a.   Counter-Plaintiffs' Version of Events

Hanson and Ingels declare that the Company "began to steadily fall apart" once Mr. Boychuk became GGGC's CEO, and that his management was a "disaster" throughout 2018 and 2019.  Hanson Decl. ¶¶ 26-27, 40; Ingels Decl. ¶¶ 20-21, 27.  According to Jenny Wagner, GGGC's bookkeeper, by August 2018, Mr. and Mrs. Boychuk had taken "100 percent control of all accounting, ordering, receiving, inventory, invoicing, banking, order fulfillment and customer service."  Declaration of Jenny Wagner ("Wagner Decl.," Dkt. 89) ¶¶ 9- 12.  Despite that control, according to Hanson and Ingels, Mr. Boychuk failed to pay vendors for significant amounts of inventory he had ordered from them, and to fulfill large purchase orders from customers.  Hanson Decl. ¶¶ 40, 42-44; Ingels Decl. ¶¶ 27, 37.  Hanson and Ingels also state that they discovered in early 2019 that Mr. Boychuk had been using his credit card for personal expenses.  Hanson Decl. ¶ 41; Ingels Decl. ¶ 28.

More central to Counter-Plaintiffs' claims is the evidence they proffer that Mr. Boychuk and Mrs. Boychuk schemed to divert various of GGGC's assets for use in creating Milburn. Several GGGC employees declare that, in July 2017, Mr. Boychuk – against Hanson's and Ingels' opposition – moved the Company's operations, including all of its inventory, machinery and equipment, from its Alberta facility to a facility Mr. Boychuk built on the Boychuks' personal property in British Columbia, Canada.  Hanson Decl. ¶¶ 28-31; Ingels Decl. ¶¶ 22-23; Wagner Decl. ¶¶ 1, 6-8.  According to Ingels, Mr. Boychuk had been running "a myriad of other businesses" from that property (Ingels Decl. ¶ 26), and according to Hanson, the facility that would house GGGC's operations "was basically a barn" that could not "run a successful manufacturing

ORDER - 4

and pick, pack and ship order fulfillment station" (Hanson Decl. ¶ 38).  Two of GGGC's suppliers – Grey Ghost, LLC ("Grey Ghost") and Grey Ghost Precision, LLC ("Grey Ghost Precision") – declare that Mr. Boychuk began to order, on GGGC's account, significant amounts of inventory for delivery to the Boychuks' property.  Declaration of Trent Domser ("Domser Decl.," Dkt. 90) ¶¶ 4-6; Declaration of Aleena McCrea ("McCrea Decl.," Dkt. 88) ¶¶ 4-9.

In June 2019, Mr. Boychuk instructed Katie Garner, GGGC's Commercial Sales Manager, to provide him with GGGC's customer, sales, pricing, and dealers lists, which Garner declares contained product pricing and discount information that was "extremely proprietary and unique to [GGGC]."  Declaration of Katie Garner ("Garner Decl.," Dkt. 87) ¶¶ 12-16.  That same month, Garner declares, she received phone calls from GGGC customers alerting her that Boychuk had contacted them, advising them that he had started a new company called "Millburn Mountain Defense" and that they should only purchase products from him.  *Id*. ¶ 17.

In July 2019, Mrs. Boychuk incorporated Milburn, which is operated out of the same facility on the Boychuks' property that was used for GGGC's operations.  Declaration of Loren Cochran ("Cochran Decl.," Dkt. 84) ¶ 4, Ex. A at 5-8; Dkt. 57, Ex. B at 21.[1]  According to Hanson and Ingels, "Mr. Boychuk simply took all the inventory, equipment, machinery and customers and started Milburn."  Hanson Decl. ¶ 53; Ingels Decl. ¶ 41.  In support of those assertions, Garner declares, based on her review of Milburn's website, that Milburn is advertising for sale the same products contained in the GGGC product list she provided to Mr. Boychuk in June 2019.  Garner Decl. ¶ 18, Ex. B.  Grey Ghost and Grey Ghost Precision (GGGC's suppliers) declare, based on their review of Milburn's sales records produced in this litigation, that Milburn, which has never

---

[1] Mrs. Boychuk is the sole shareholder and director of Milburn, which also employs Mr. Boychuk.  Dkt. 57, Ex. B at 9.

purchased inventory from Grey Ghost and Grey Ghost Precision, has been selling the same products that those suppliers previously provided to GGGC.  Domser Decl. ¶¶ 7-12; McCrea Decl. ¶¶ 10-16.  Garner similarly declares, based on her review of Milburn's sales records, that Milburn has been selling inventory that had been purchased for GGGC.  Garner Decl. ¶¶ 20-24.

According to Counter-Plaintiffs, Mr. Boychuk also transferred to Milburn a research grant in which GGGC had been participating with the University of Alberta and Canada's Natural Sciences and Engineering Research Council ("NSERC").  Specifically, Ingels declares that, throughout 2016 and 2017, GGGC and the University of Alberta had collaborated in preparing and submitting a grant proposal to NSERC to conduct research into body armor.  Ingels Decl. ¶¶ 29-31.  In April 2020, GGGC was informed by the University of Alberta that GGGC's role in the grant had been transferred to Milburn.  *Id.* ¶ 32.  Based on documents reviewed by Ingels and submitted with the Motion – including (1) a letter and grant documents reflecting that Mr. Boychuk had been representing himself to University of Alberta and NSERC as GGGC's sole owner (*id.*, Exs. B-C); and (2) a May 2020 invoice associated with the grant, addressed to Milburn and bearing Mr. Boychuk's and Mrs. Boychuk's names (*id.*, Ex. A) – Ingels declares that he believes Mr. Boychuk transferred the grant to Milburn.[2]

### b.  Counter-Defendants' Version of Events

Counter-Defendants dispute that Mr. Boychuk mismanaged GGGC or that he and Mrs. Boychuk undertook a scheme to misappropriate GGGC's assets.  With respect to GGGC's management, Mr. Boychuk and Mrs. Boychuk both declare that neither of them had full control

---

[2] While not relevant to the Court's resolution of the Motion, Counter-Plaintiffs point to evidence of other improper conduct, including Mr. and Mrs. Boychuk's use of a Nicaraguan manufacturer, Alternative Manufacturing, to produce counterfeit versions of Grey Ghost products – ordered on GGGC's behalf – that were then branded and sold as Milburn products.  Domser Decl. ¶¶ 13-14, Ex. C.

ORDER - 6

over the Company's operations or maintained a higher level of access to GGGC's inventory ordering or accounting system than other GGGC employees.   Mr. Boychuk Decl. ¶¶ 9, 13; Declaration of Krystle Boychuk ("Mrs. Boychuk Decl.," Dkt. 104-2) ¶¶ 2-3.   In actuality, they declare, Hanson and Ingels "remained actively involved in the management of GGGC," and Hanson alone had the highest access credentials to the accounting system.   Mr. Boychuk Decl. ¶¶ 9, 13; Mrs. Boychuk Decl. ¶¶ 2-3.   Mr. and Mrs. Boychuk also deny Ingels' and Hanson's assertions that Mr. Boychuk had been using his company credit card for personal expenses.   Mr. Boychuk Decl. ¶ 14; Mrs. Boychuk Decl. ¶ 4.

Responding to Counter-Plaintiffs' misappropriation allegations, Mr. Boychuk declares that Ingels had approved his decision to move the Company's operations to the Boychuks' property in order to resolve ongoing issues with the Alberta facility's lease and with the Company's former CEO, Bremmer.  Mr. Boychuk Decl. ¶¶ 12, 28.  Mr. Boychuk further declares that neither Counter-Defendants nor Mrs. Boychuk retained any GGGC assets beyond certain small-value items that the Company never sought to recover.[3]  *Id.* ¶ 29.  Mr. Boychuk does not deny that Milburn made use of GGGC's customer and sales lists or inventory purchased for GGGC.  Instead, he declares only that Plaintiffs had "purchased new production equipment for Milburn" (Mr. Boychuk Decl. ¶ 27) and that Noppers – who, at some point, left GGGC for Milburn – was Milburn's primary salesperson who did "most of the product ordering" (*id*. ¶ 19).  In his declaration, Noppers says nothing about Milburn's product ordering or sales.  *See* Noppers Decl.  Mrs. Boychuk, however, declares that Milburn never sold GGGC inventory, and that the products Milburn sold had been

---

[3] Specifically, Mr. Boychuk declares that he has retained approximately $8,000 in nylon and a defective armor press that is "likely only worth scrap value."  Mr. Boychuk Decl. ¶ 29.

ORDER - 7

newly manufactured, and sold to Milburn, by Alternative Manufacturing.  Mrs. Boychuk Decl. ¶ 9; *see supra* at n.2.

In June 2019, Mr. Boychuk and Hanson discussed possible ways of disentangling GGI from CFA, including through a dissolution of GGGC or one party's purchase the other's stake in the Company.  Hanson Decl. ¶¶ 49-50, Ex. C.  No such arrangement ever came to fruition.  *Id.*

### B.  Procedural History

This lawsuit was filed by CFA and Mr. Boychuk on May 29, 2020.  In response, GGI and GGGC filed counterclaims ("CC," Dkt. 44) against Counter-Defendants, asserting claims for (1) breach of fiduciary duty; (2) conspiracy to breach fiduciary duty; (3) violation of Washington's Uniform Trade Secrets Act ("WUTSA"), RCW § 19.108; (4) unjust enrichment; (5) conversion; (6) an accounting; and (7) the judicial dissolution of GGGC.  *See* CC ¶¶ 30-94.  On December 7, 2021, GGI moved for summary judgment on all of CFA's and Mr. Boychuk's claims against it, and separately moved for moved for summary judgment on most of GGI's counterclaims against Counter-Defendants.  Dkt. 83.  GGGC did not move for summary judgment on its counterclaims. In an Order dated October 18, 2022, the Court granted GGI's motion as to CFA's and Mr. Boychuk's claims against it, but struck GGI's motion as to its counterclaims in light of questions raised by the Court as to whether GGI had standing to assert its counterclaims, and whether WUTSA applied to Counter-Defendants' alleged conduct.  *Id.* at 10-21.  The Court permitted Counter-Plaintiffs to file a renewed motion that addresses the Court's questions concerning GGI's counterclaims and, if they so choose, seeks summary judgment on GGGC's claims.  *Id.*

Counter-Plaintiffs filed their renewed summary judgment motion on October 18, 2022.  In it, they seek summary judgment on most of the counterclaims asserted by both GGI and GGGC; they brief the issue of GGI's standing; and they withdraw their WUTSA claims.  Counter-

ORDER - 8

Defendants opposed the Motion ("Opp.," Dkt. 104) and Counter-Plaintiffs replied ("Rep.," Dkt. 105).

### III.    STANDARD OF REVIEW

"The standard for summary judgment is familiar: 'Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact.'"  *Zetwick v. County of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017) (quoting *United States v. JP Morgan Chase Bank Account No. Ending 8215*, 835 F.3d 1159, 1162 (9th Cir. 2016)).  "The moving party bears the initial burden of identifying portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim."  *InteliClear, LLC v. ETC Glob. Holdings, Inc*., 978 F.3d 653, 657 (9th Cir. 2020).  "If the moving party meets this burden, the opposing party must then set out specific facts showing a genuine issue for trial to defeat the motion."  *Id.*  If the evidence proffered by the opposing party "is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249-50 (1986) (citations and quotation marks omitted).

### IV.    DISCUSSION

Counter-Plaintiffs seek summary judgment on five of the claims asserted by both GGI and GGGC: (1) breach of fiduciary duty, asserted against Mr. Boychuk (CC ¶¶ 30-39); (2) conspiracy to breach fiduciary duty, asserted against Mr. Boychuk, CFA and Milburn (*id*. ¶¶ 40-47); (4) unjust enrichment, asserted against Mr. Boychuk, CFA and Milburn (*id*. ¶¶ 58-71); and (5) conversion, asserted against Mr. Boychuk, CFA and Milburn (*id*. ¶¶ 77-83).

A.  <u>**Whether GGI Has Standing to Assert its Claims**</u>

Counter-Defendants contend that GGI lacks Article III standing to assert the claims on which it moves for summary judgment.  *See* Opp. at 9.  The Court agrees.

"'The party invoking federal jurisdiction bears the burden of establishing' standing," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411-12 (2013) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)), which is a "threshold matter central to our subject matter jurisdiction." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007).  "Generally, a shareholder does not have standing to redress an injury to the corporation."  *Shell Petroleum, N.V. v. Graves*, 709 F.2d 593, 595 (9th Cir. 1983).  To have standing, "a shareholder must assert more than personal economic injury resulting from a wrong to the corporation," but instead "must be injured directly and independently of the corporation."  *Id.*; *see Grizzard v. Terada*, 159 F. App'x 786, 787 (9th Cir. 2005) ("Shareholders [] typically lack standing where the harm they suffered was derivative to the injury suffered by the corporation.").

The Court finds that GGI fails to satisfy its burden of establishing that it has standing to assert the claims on which it seeks summary judgment.  All of GGI's claims, as explained by Counter-Plaintiffs in their motion, are premised on the alleged misuse of GGGC's funds and misappropriation of its inventory and other assets.  *See, e.g.*, Mot. at 17 (arguing that Mr. Boychuk breached his fiduciary duty to GGI through "his use of GGGC's inventory and assets to capitalize and the operate a competing business"), at 21 (arguing that Mr. Boychuk, CFA and Milburn were unjustly enriched by their "dominion and control over GGGC's, inventory, equipment, and intellectual property").  The only asset or economic interest belonging to GGI referenced anywhere in the Motion is GGI's investment in GGGC.  *See, e.g.*, Mot. at 12 (arguing that Counter-Defendants "deprive[d] GGI of its investment").  However, the Ninth Circuit has held on numerous

ORDER - 10

occasions that shareholders' injuries consisting of a devaluation of their stock in a company are "clearly derivative because that is an injury that fell on every stockholder, majority and minority alike, and fell on each on a per share basis." *Uthe Tech. Corp. v. Aetrium Inc.*, 739 F. App'x 903, 905 (9th Cir. 2018) (citations and quotation marks omitted) (shareholder's allegations that "[c]onspirators stole [company's] customers and thus harmed [company's] business, thereby reducing the value of [company's] stock" set forth an indirect injury insufficient for standing); *see Ahn v. Hanil Dev., Inc.*, 471 F. App'x 615, 617 (9th Cir. 2012) ("depreciation in the value of [] stock resulting from a depletion of corporate assets … is a direct injury to the corporation and only an incidental injury to its shareholders" (citation omitted)).  Absent any demonstrated harm suffered by GGI independent of the alleged injury to GGGC, GGI cannot establish that it has standing to assert its claims for breach of fiduciary duty, conspiracy, unjust enrichment, and conversion.  Those claims properly belong to GGGC as the allegedly injured corporation.[4]

The Court, accordingly, lacks subject matter over those claims and therefore dismisses them.  *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

## B.  Claims Asserted by GGGC

Counter-Plaintiffs seek summary judgment on GGGC's claims "to the extent GGGC (and not GGI) is the entity entitled to pursue those claims."  Mot. at 22-23.  In their short briefing on GGGC's claims, Counter-Plaintiffs largely summarize the arguments they make with respect to

---

[4] Counter-Plaintiffs argue that GGI should be entitled to assert its claims because, if a judgment were awarded to GGGC instead, then CFA and Mr. Boychuk – as wrongdoers – would unfairly share in that recovery given that CFA is a GGGC shareholder and Mr. Boychuk owns CFA.  *See* Mot. at 13; Rep. at 18-19.  The Court is aware of no authority supporting that argument, and the case Counter-Plaintiffs cite – which dealt with a shareholder asserting a contract-based claim based on specific contract rights he individually held – is plainly inapposite.  *See Yerkovich v. Pinnacle Processing Grp., Inc.*, 173 Wash. App. 1013 (Wn. Ct. App. 2013).

ORDER - 11

GGI's claims.  The Court, therefore, reviews GGGC's claims based on the theories of liability, and the events upon which those theories are premised, that Counter-Plaintiffs set forth in briefing GGI's claims.

### 1.   Whether GGGC's Claims Are Authorized and Procedurally Proper

In opposing GGGC's claims, Counter-Defendants argue, as an initial matter, that "[t]here is no showing that any person on Counter-Plaintiffs' side is authorized to bring claims directly on behalf of the company."  Opp. at 16.  Counter-Plaintiffs, however, submit a declaration from Ingels stating that he and Hanson (GGGC's now sole directors) unanimously approved the prosecution of GGGC's counterclaims and instructed Counter-Plaintiffs' counsel to do so.  Dkt. 106 ¶ 4.  Counter-Defendants also argue that "Counter-Plaintiffs [] fail to demonstrate any compliance with the prerequisites of Washington's derivative claims statutes."  Opp. at 16 (citing RCW 23B.07.400 and CR 23.1).  Given that this lawsuit was originally filed in federal court, Washington's derivative claims statutes do not apply.  *See Sax v. World Wide Press, Inc*., 809 F.2d 610, 613 (9th Cir. 1987) ("In federal courts, derivative suits are subject to the procedural requirements of Fed. R. Civ. P. 23.1.").  More importantly, as Ingels' declaration demonstrates, GGGC's counterclaims are not being asserted derivatively by a shareholder (*i.e.*, GGI), but instead are being asserted directly by GGGC itself.  Dkt. 106 ¶ 4.  Accordingly, GGGC's claims are both authorized by the Company and procedurally proper.

### 2.   GGGC's Claim for Breach Fiduciary of Fiduciary Duty

GGGC asserts a claim against Mr. Boychuk for breaching his fiduciary duty to the Company.  CC ¶¶ 35-39.  While Counter-Plaintiffs' counterclaims allege various actions by Mr. Boychuk that could potentially serve as the basis for such a claim, the Motion premises GGGC's claim, specifically, on Mr. Boychuk's alleged use of company funds for personal expenses, and

his "use of GGGC's inventory and assets to capitalize and the operate a competing business (Milburn)." Mot. at 15-17, 23.

Mr. Boychuk's alleged actions implicate his "fiduciary duty of good faith and loyalty," which all directors and officers owe to the corporations they serve. *See Real Carriage Door Co., Inc. ex. rel. Rees v. Rees*, 17 Wash. App. 2d 449, 465 (Wn. Ct. App. 2021); *see also* RCW § 23B.08.420(1) (requiring corporate officers to discharge their duties "[i]n good faith" and "[i]n a manner the officer reasonably believes to be in the best interests of the corporation"). Consistent with that duty, "[o]fficers are forbidden from acquiring profit for themselves – directly or indirectly – at the expense of the company." *Lodis v. Corbis Holdings, Inc*., 172 Wash. App. 835, 861 (Wn. Ct. App. 2013) (citing *State ex rel. Hayes Oyster Co. v. Keypoint Oyster Co*., 64 Wash. 2d 375, 381 (Wn. Sup. Ct. 1964)); *see AT&T Corp. v. Walker*, No. 04-cv-5709, 2006 WL 2927659, at *3 (W.D. Wash. Oct. 12, 2006) ("The duty of loyalty requires that officers and directors scrupulously act to protect the interests of the corporation, and to refrain from injuring the corporation and demands unselfish loyalty to the corporation, free of conflict between duty and self interest.").

### a.  Alleged Use of Company Funds for Personal Expenses

Counter-Plaintiffs assert that Mr. Boychuk used his company credit card to make personal purchases, and deposited checks drawn on GGGC's bank accounts into his personal bank account. *See* Mot. at 23. While this type of conduct, if proven, could certainly constitute a breach of fiduciary duty, *see, e.g.*, *Interlake Porsche & Audi, Inc. v. Bucholz*, 45 Wash. App. 502, 509 (Wn. Ct. App. 1986) (finding that "unauthorized personal use of corporate funds" constituted breach of fiduciary duty), the Court finds that Counter-Plaintiffs have failed to establish the absence of a dispute of fact as to whether Mr. Boychuk engaged in that conduct.

ORDER - 13

With respect to Mr. Boychuk's alleged credit card use, Counter-Plaintiffs point to declarations from Ingels, Hanson, and a forensic accountant retained for this litigation, that Mr. Boychuk's company credit card statements reflect over $63,000 in charges from, among other things, Amazon and Uber.  *See* Ingels Decl. ¶ 28; Hanson Decl. ¶ 41; Declaration of John Smith ("Smith Decl.," Dkt. 91), Ex. A at 9.  Mr. and Mrs. Boychuk, on the other hand, declare that those charges were solely for business expenses.[5]  Mr. Boychuk Decl. ¶ 14; Mrs. Boychuk Decl. ¶ 4.  In light of this competing testimony, the Court cannot find that there exists no genuine dispute as to whether Mr. Boychuk used his company card for personal expenses.  *See Kumar v. Entezar*, No. 11-cv-1082, 2014 WL 352690, at *4 (W.D. Wash. Jan. 24, 2014) (denying summary judgment on claim for breach of fiduciary duty, premised in part on the alleged misuse of company funds for personal use, where "evidence of wrongdoing [was] equivocal").

With respect to Mr. Boychuk's alleged misuse of company checks, Counter-Plaintiffs allege that Mr. Boychuk "improperly directed that several checks totaling at least $4,900.00 … be signed by his wife, made payable to Mr. Boychuk."  Mot. at 23.  However, the only evidence of this conduct is a declaration from Counter-Plaintiffs' forensic accountant – who was retained for this lawsuit, and was not a witness to the events at issue – stating that he reviewed the checks in question.  Smith Decl., Ex. A at 10.  No fact witness has offered any testimony concerning those checks or the circumstances surrounding them.  Moreover, copies of those checks have not been submitted to the Court for its review.  Accordingly, the evidence is inadequate for the Court to conclude that Mr. Boychuk improperly cut himself company checks.  Therefore, the Court finds that there is a genuine issue as to whether Mr. Boychuk used company funds for personal expenses.

---

[5] For example, Mrs. Boychuk explains in her declaration that the Amazon charges were for office supplies purchased for GGGC's facility.  Mrs. Boychuk Decl. ¶ 4.

**b. Alleged Misappropriation of GGGC's Assets for Milburn's Use**

Counter-Plaintiffs claim that Mr. Boychuk diverted, for Milburn's use, four types of assets belonging to GGGC: (1) machinery and equipment, (2) trade secrets, (3) inventory, and (4) the NSERC research grant. *See* Mot. at 15-19. The Court will review whether Counter-Plaintiffs have demonstrated beyond any factual dispute that Mr. Boychuk breached his fiduciary duty with respect to each alleged form of misappropriation.

### i. Alleged Misappropriation of Machinery and Equipment

The Court finds that there exists a genuine issue of fact as to whether Mr. Boychuk misappropriated GGGC's machinery and equipment for Milburn's use. Counter-Plaintiffs rely on several witnesses' declarations that GGGC had initially purchased various machinery and equipment for use at the Alberta facility – including, among other things, a hydraulic armor press and air compressors (*see* Hanson Decl. ¶ 7; Garner Decl. ¶ 8) – and that Mr. Boychuk later moved GGGC's machinery and equipment to his personal property. *See* Hanson Decl. ¶¶ 30-31, 52; Ingels Decl. ¶¶ 23, 41; Wagner Decl. ¶¶ 6-7. However, absent from those declarations are any concrete facts specifically pointing to Milburn's actual use of any of that machinery or equipment. Indeed, the declarations submitted by both Counter-Plaintiffs and Counter-Defendants specifically identify only a single armor press as having, ultimately, been physically present on the Boychuks' property. *See* Mot. at 7; Hanson Decl. ¶¶ 44, 52; Ingels Decl. ¶¶ 37, 39; Mr. Boychuk Decl. ¶¶ 17, 27; Noppers Decl. ¶¶ 7, 9. With respect to that armor press, Counter-Defendants contend that the armor press was defective when it was moved to the Boychuks' property and never became functional, and proffer declarations and contemporaneous emails in support of that contention.[6]

---

[6] According to Mr. Boychuk, GGGC has simply declined to retrieve the defective armor press from his property. Mr. Boychuk Decl. ¶ 27, 29.

*See* Mr. Boychuk Decl. ¶¶ 27, 29, Ex. 7; Noppers Decl. ¶ 9.  Further, Mr. Boychuk has submitted a declaration alleging that all new production equipment had been purchased for Milburn, and that Milburn had not made use of GGGC's equipment and machinery.  *See* Mr. Boychuk Decl. ¶ 27. The Court, therefore, finds that there exists a genuine dispute as to whether Mr. Boychuk misappropriated GGCC's machinery and equipment for Milburn's use.

### ii.   *Alleged Misappropriation of Trade Secrets*

The Court also finds that a genuine issue of fact exists as to whether Mr. Boychuk misappropriated GGGC's trade secrets.  Counter-Plaintiffs submit to the Court, in support for their claim that Mr. Boychuk engaged in such conduct, a declaration from Katie Garner, GGGC's Commercial Sales Manager, stating that Mr. Boychuk had asked her for – and she provided him with – various information (*e.g.*, customer, sales, pricing, and dealers lists) that she describes as "extremely proprietary and unique to" GGGC.  Garner Decl. ¶ 12.  While Counter-Defendants do not dispute Garner's specific statement that she had provided this information to Mr. Boychuk, they dispute her characterization of it as confidential.  Counter-Defendants point, in particular, to Mrs. Boychuk's declaration that all of that information was public and shared with dealers in the regular course of business, and that the identities of GGGC's dealers themselves were posted on GGGC's website.  Mrs. Boychuk Decl. ¶¶ 8, 10.  In light of this competing testimony as to whether the information at issue was confidential, and given that it has not been submitted to the Court in any form, the Court is in no position to find, as a factual matter, that Mr. Boychuk mishandled GGGC's confidential information.  Accordingly, the Court finds that there exists a genuine dispute as to whether Mr. Boychuk misappropriated GGGC's trade secrets.

ORDER - 16

### iii. *Alleged Misappropriation of Inventory*

The Court finds that Counter-Plaintiffs have adequately demonstrated that Mr. Boychuk misappropriated GGGC's inventory in breach of his duty of loyalty. There is certainly a genuine dispute as to whether Mr. Boychuk had embarked on a scheme to misappropriate inventory when he moved GGGC'S operations to the Boychuks' property. On the one hand, Hanson and Ingels declare that, despite GGGC having thriving operations at its initial Alberta facility, Mr. Boychuk decided without reason to move GGGC's operations to a bare facility on his property. Hanson Decl. ¶¶ 7-10, 13, 28-31; Ingels Decl. ¶¶ 7-8, 22-3. On the other hand, Mr. Boychuk declares that his decision to move GGGC's operations away from the Alberta facility – described by him and Noppers as nothing more than an "unfinished warehouse" – was based on legitimate business reasons. *See* Mr. Boychuk Decl. ¶¶ 3-5, 12, 28; Noppers Decl. ¶ 5.

Nevertheless, a review of the evidence demonstrates that, after GGGC's operations had been moved to the Boychuks' property, Mr. Boychuk misappropriated GGGC's inventory for Milburn's use. As an initial matter, while the parties dispute the level of control Mr. Boychuk had over the Company's operations, it is undisputed that Mr. Boychuk was able to order inventory on GGGC's behalf. *See supra* at 4-5. Indeed, GGGC's suppliers, Grey Ghost and Grey Ghost Precision, declare that Mr. Boychuk himself ordered over $300,000 in inventory from them. *See* Domser Decl. ¶¶ 4-5; McCrea Decl. ¶ 6. According to those suppliers, they never sold inventory to Milburn. *See* Domser Decl. ¶ 10; McCrea Decl. ¶ 14. In spite of that, they – and GGGC's Commercial Sales Manager (Garner) – declare, based on their review of Milburn's sales records, that Milburn had been selling the same Grey Ghost and Grey Ghost Precision inventory that Mr. Boychuk had ordered on GGGC's account. *See* Domser Decl. ¶¶ 7-12; McCrea Decl. ¶¶ 10-16; Garner Decl. ¶¶ 20-24. This Court also observes many entries in Milburn's sales records reflecting

the sale of Grey Ghost and Grey Ghost Precision products. *See* Cochran Decl., Ex. B. There is thus compelling evidence that Mr. Boychuk diverted GGGC's inventory to Milburn so that Milburn could sell it as its own.

Confronted with this evidence, Counter-Defendants "were obliged to produce some 'significant probative evidence' tending to refute" it in order to survive summary judgment. *See In re Lewis*, 97 F.3d 1182, 1187 (9th Cir. 1996) (citation omitted) ("conclusory arguments unsupported by factual statements or evidence" were inadequate to refute evidence of asset misappropriation). However, Counter-Defendants point only to Mrs. Boychuk's declaration that Milburn "had all new products made through Alternative Manufacturing." Mrs. Boychuk Decl. ¶ 9; *see* Opp. at 6. That statement is not only unsupported by any documentation, it is betrayed by Alternative Manufacturing's sales records – proffered by Counter-Plaintiffs – reflecting that Milburn placed its first order with Alternative Manufacturing several months after Milburn began selling Grey Ghost and Grey Ghost Precision products. *Compare* Domser Decl., Ex. A *with id*. ¶ 14, Ex. C. Furthermore, Mrs. Boychuk's declaration provides no explanation as to why Milburn's sales records reflect that Milburn had been selling Grey Ghost and Grey Ghost Precision products.

The Court therefore finds, based on the evidence presented, that Counter-Defendants have failed to create a genuine dispute as to whether Mr. Boychuk misappropriated GGGC's inventory for the benefit of himself – as a Milburn employee – and his wife – as Milburn's owner – at GGGC's expense. Accordingly, Counter-Plaintiffs have adequately demonstrated that Mr. Boychuk breached his fiduciary duty to GGGC in this regard. *See Delta Dev. & Inv. Co. v. Hsiyuan*, 114 Wash. App. 1057 (Wn. Ct. App. 2002) (upholding finding that defendant's use of company "as a vehicle" to acquire property for his personal benefit constituted a breach of his fiduciary duty).

ORDER - 18

### iv.  Alleged Misappropriation of Research Grant

The Court also finds that Counter-Plaintiffs have demonstrated that Mr. Boychuk breached his duty of loyalty to GGGC by misappropriating the NSERC research grant.  As discussed above, Counter-Plaintiffs proffer evidence that, at Mr. Boychuk's request, the research grant was transferred to Milburn around April 2020.  *See* Ingels Decl. ¶¶ 29-35, Exs. A-C.  Counter-Defendants do not refute that evidence or even address Counter-Plaintiffs' contention that it demonstrates Mr. Boychuk's involvement in transferring the research grant.  Therefore, Counter-Defendants do not present any evidence (or even argument) that could create a genuine dispute that Mr. Boychuk diverted the research opportunity for his and Mrs. Boychuk's benefit.  This Court, viewing the evidence in Counter-Defendants' favor, finds that there is no such dispute.  Therefore, Counter-Plaintiffs have adequately demonstrated that Mr. Boychuk breached his duty of loyalty to GGGC in this regard as well.

### 3.  GGGC's Claim for Conspiracy to Breach Fiduciary Duty

GGGC asserts a civil conspiracy claim against Mr. Boychuk, CFA and Milburn, premised on allegations that those parties entered into a conspiracy to have Mr. Boychuk breach his fiduciary duty to the Company by misappropriating and transferring its equipment, inventory, and other assets.  CC ¶¶ 40-47; *see* Mot. at 22.

To establish a civil conspiracy, the plaintiff "must prove by clear, cogent and convincing evidence that (1) two or more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means; and (2) the conspirators entered into an agreement to accomplish the object of the conspiracy."  *Wilson v. State*, 84 Wash. App. 332, 350-51 (Wn. Sup. Ct. 1996).  "Because the conspiracy must be combined with an unlawful purpose, civil conspiracy does not exist independently – its viability hinges on the existence of a cognizable

and separate underlying claim." *Williams v. Geico Gen. Ins. Co.*, 497 F. Supp. 3d 977, 985 (W.D. Wash. 2020).  Counter-Plaintiffs, as discussed above, have adequately demonstrated an unlawful purpose, to wit: Mr. Boychuk's breach of fiduciary duty through his misappropriation of the Company's inventory and research grant.  *See supra* at 17-19.  What remains for GGGC to prevail on its civil conspiracy claim is to establish that there existed an agreement to accomplish that purpose.

To have a conspiratorial agreement, the alleged coconspirators "must have reached a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement."  *Curow-Ray v. City of Tumwater*, No. 09-cv-5633, 2010 WL 3222505, at *13 (W.D. Wash. Aug. 12, 2010).  "Washington courts hold that because the evidence of the conspiracy is typically in control of the alleged conspirators, conspiracy is usually susceptible of no other proof than that of circumstantial evidence."  *Swartz v. Deutsche Bank*, No. 03-cv-1252, 2008 WL 1968948, at *12 (W.D. Wash. May 2, 2008) (citation and quotation marks omitted).  As such, "[a] plaintiff may rely upon circumstantial evidence in order to assert a claim of civil conspiracy: 'A defendant's knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and from evidence of the defendant's actions.'"  *Villalobos v. Deutsche Bank Nat'l Tr. Co.*, No. 09-cv-1450, 2011 WL 13232599, at *4 (W.D. Wash. May 3, 2011) (quoting *Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999)).  Federal courts have found that strong circumstantial evidence of a conspiratorial agreement can be sufficient to prevail on a civil conspiracy claim at the summary judgment stage.  *See, e.g.*, *Clay Fin. LLC v. Mandell*, No. 16-cv-11571, 2018 WL 4682339, at *15 (N.D. Ill. Sept. 28, 2018) (granting summary judgment to plaintiff on civil conspiracy claim based on "ample evidence that [defendant] not only knew about [co-conspirator's] fraudulent conduct but also planned … and assisted … the fraud");

ORDER - 20

*Buckman Lab'ys Int'l, Inc. v. Pita*, No. 05-cv-2431, 2008 WL 2279752, at *4 (W.D. Tenn. May 29, 2008) (plaintiff's undisputed evidence that defendants "worked together to form and operate [company] in order to usurp [plaintiff's] profits" and "leverage [plaintiff's] resources to their advantage" was sufficient to grant summary judgment on civil conspiracy claim).

As noted above, Counter-Plaintiffs allege that a conspiratorial agreement existed among Mr. Boychuk, CFA, and Milburn. *See* CC ¶¶ 40-47. While Counter-Plaintiffs claim that CFA was a coconspirator, Counter-Defendants deny that CFA had any connection to the scheme to misappropriate GGGC's assets. The Court finds that this is a dispute fact, and therefore does not conclude that CFA was a member of the alleged conspiracy.

On the other hand, Counter-Plaintiffs have established a conspiracy between Mr. Boychuk and Milburn. Although there is no direct evidence of a conspiratorial agreement, there is uncontested circumstantial evidence of one. As a general matter, it is undisputed that Mr. Boychuk, GGGC's CEO and director, worked alongside Mrs. Boychuk, Milburn's sole shareholder and director. Mrs. Boychuk, who is married to Mr. Boychuk, had significant involvement in GGGC's business operations as its employee (*see, e.g.*, Wagner Decl. ¶¶ 9-12), and by her own account, she "helped [Mr. Boychuk] in his dealings with [GGGC]." Mrs. Boychuk Decl. ¶ 1. It is also undisputed that Mr. Boychuk was employed by Milburn upon its incorporation by Mrs. Boychuk (*see* Dkt. 57, Ex. B at 9), and by his own account, he was involved in Milburn's business operations. *See, e.g.*, Mr. Boychuk Decl. ¶ 20. Thus, Mr. Boychuk was not only employed by Milburn, but he was acting in close coordination with its management (*i.e.*, his spouse) at the time he breached his fiduciary duty to GGGC.

Moreover, there is significant uncontroverted evidence that Mr. Boychuk and Milburn were acting in concert, specifically, in furtherance of his misappropriation of GGGC's inventory and

research grant.  With respect to GGGC's inventory, it is undisputed that Mr. Boychuk instructed GGGC's Commercial Sales Manager (Garner) to provide him with GGGC's customer and sales list one month before Milburn's June 2019 incorporation.  *See* Garner Decl. ¶ 17; Cochran Decl. ¶ 4, Ex. A at 5-8.  One month after that, in July 2019, Milburn began selling the Grey Ghost and Grey Ghost Precision inventory that Boychuk had ordered on GGGC's account.  *See* Domser Decl., Ex. C.  This uncontroverted evidence establishes that Mr. Boychuk and Milburn possessed a "common design and understanding" for Mr. Boychuk to misappropriate GGGC's inventory, in breach of the duties he owed to GGGC.  *See Curow-Ray v. City of Tumwater*, 2010 WL 3222505, at *13.

Counter-Plaintiffs have also presented abundant circumstantial evidence of a conspiratorial agreement between Mr. Boychuk and Milburn with respect to his misappropriation of the NSERC research grant.  As discussed above, Mr. Boychuk – using his position as GGGC's CEO, and representing himself to the University of Alberta and NSERC as GGGC's owner – transferred the research grant to Milburn.  *See supra* at 6.  Further, the May 2020 grant invoice proffered by Counter-Plaintiffs evidences that Mrs. Boychuk was also involved in Milburn taking over the research grant.  *See* Ingels Decl., Ex. C.  In all events, the result speaks for itself.  Counter-Plaintiffs' undisputed evidence that Mr. Boychuk transferred the research grant to Milburn establishes that he and Milburn had agreed to accomplish his misappropriation of the research grant, in breach of the fiduciary duty he owed to Company.

Accordingly, in light of the overwhelming circumstantial evidence of a conspiratorial agreement between Mr. Boychuk and Milburn, the Court finds that no reasonable juror could find other than that those parties conspired for Mr. Boychuk to breach his fiduciary duty to GGGC.

ORDER - 22

Therefore, the Court will grant summary judgment to GGGC, as to liability, on its civil conspiracy claim against Mr. Boychuk and Milburn.

### 4. GGGC's Claim for Unjust Enrichment

"Unjust enrichment is the method of recovery for the value of the benefit retained absent any contractual relationship because notions of fairness and justice require it." *Young v. Young*, 164 Wash. 2d 477, 484 (Wn. Ct. App. 2008). To prevail on such a claim, the plaintiff must establish: "a benefit conferred upon the defendant by the plaintiff; an appreciation or knowledge by the defendant of the benefit; and the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Id.* (citation omitted).

GGGC's unjust enrichment claim, asserted against Mr. Boychuk, CFA, and Milburn, is premised on those parties' alleged "control over GGGC's, inventory, equipment, and intellectual property" for purposes of forming and operating Milburn. CC ¶¶ 58-63; *see* Mot. at 20-21. As discussed above, the Court has found that, while there exists a genuine dispute as to whether GGGC's equipment and intellectual property were diverted for Milburn's use, no such dispute exists with respect to GGGC's inventory. The Court finds, given the uncontroverted evidence that Milburn had been selling that inventory as its own (*see supra* at 17-19), that no reasonable juror could conclude other than that Milburn and Mr. Boychuk (as Milburn's employee and the spouse of Milburn's owner) received the benefit of GGGC's inventory, and that it would be inequitable for those parties to retain that benefit without payment. Nevertheless, the Court does not find that the same applies to CFA. While CFA may very well have received a benefit from the diversion of GGGC's inventory, Counter-Plaintiffs have not established the manner or extent of such benefit, and therefore the Court will not grant summary on this claim as against CFA. Accordingly, the

1   Court will grant summary judgment to GGGC on its unjust enrichment claim, but only as against

2   Milburn and Mr. Boychuk.

3       **5.  GGGC's Claim for Conversion**

4       "Conversion is the unjustified, willful interference with a chattel which deprives a person

5   entitled to the property of possession."  *In re Marriage of Langham & Kolde*, 153 Wash. 2d 553,

6   564 (Wn. Sup. Ct. 2005) (finding that a stock option can constitute chattel).  GGGC asserts a

7   conversion claim against Mr. Boychuk, CFA, and Milburn, premised on allegations that those

8   parties "took possession of GGGC's confidential information, inventory and equipment, with the

9   intent to permanently deprive GGGC of those assets."  Mot. at 21; *see* CC ¶¶ 72-76.  As discussed

10  above, while a dispute of fact exists as to whether GGGC's confidential information and equipment

11  were misappropriated, Counter-Plaintiffs have established that GGGC's inventory was diverted

12  by Mr. Boychuk for Milburn's use.  Given the overwhelming evidence that Mr. Boychuk and

13  Milburn conspired to that end (*see supra* at 21-23), the Court finds that no reasonable juror could

14  find other than that those parties converted Milburn's inventory.  However, given the genuine

15  dispute of fact as to whether CFA played a role in that scheme, the Court finds that Counter-

16  Plaintiffs fail to demonstrate that CFA willfully deprived GGGC of its inventory.

17      Accordingly, the Court will grant summary judgment to GGGC on its conversion claim as

18  against Milburn and Mr. Boychuk, but will deny summary judgment as against CFA.

19      **6.  GGGC's Damages**

20      The Court finds that the record is insufficiently complete to award GGGC damages without

21  first holding a hearing on that subject.  Accordingly, the Court declines to make any findings as to

22  GGGC's damages at this time.

ORDER - 24

# V.     CONCLUSION

NOW, THEREFORE, the Court GRANTS in part and DENIES in part Counter-Plaintiffs' renewed motion for summary judgment (Dkt. 100) as follows:

1. The Court GRANTS summary judgment to Counter-Plaintiff GGGC on its claim against Mr. Boychuk for breach of fiduciary duty as to the misappropriation of GGGC's inventory and research grant, and DENIES summary judgment on that claim as to the alleged misappropriation of GGGC's corporate funds, trade secrets, and equipment and machinery.

2. The Court GRANTS summary judgment to Counter-Plaintiff GGGC on its claim for conspiracy to breach fiduciary duty as against Mr. Boychuk and Milburn, and DENIES summary judgment on that claim as against CFA.

3. The Court GRANTS summary judgment to Counter-Plaintiff GGGC on its claim for unjust enrichment as against Mr. Boychuk and Milburn, and DENIES summary judgment on that claim as against CFA.

4. The Court GRANTS summary judgment to Counter-Plaintiff GGGC on its claim for conversion as against Mr. Boychuk and Milburn, and DENIES summary judgment on that claim as against CFA.

5. The Court DISMISSES all of Counter-Plaintiff GGI's claims for lack of standing.

SO ORDERED.

Dated:  December 28, 2022

_Barbara J. Rothstein_

Barbara Jacobs Rothstein
U.S. District Court Judge

ORDER - 25